UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FRANK GONZALEZ,

                                    Plaintiff,                              14-CV-06206 (SN)

                    -against-                                       OPINION AND ORDER

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

        *Pro se* plaintiff Frank Gonzalez brings this action pursuant to Section 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination

of the Commissioner of Social Security (the "Commissioner") denying his application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (collectively,

"disability benefits"). The Commissioner moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.

        Because I find that the decision of the administrative law judge ("ALJ") is supported by

substantial evidence and does not contain legal error requiring remand, the Commissioner's

motion for judgment on the pleadings is GRANTED, and the case is dismissed with prejudice.

## PROCEDURAL BACKGROUND

        Gonzalez first applied for DIB in 2005, and his application was denied in May 2007. On

February 1, 2010, Gonzalez again filed an application for DIB, and on February 18, 2010, he

filed an application for SSI, alleging a disability onset date of August 1, 1997, due to HIV,

neuropathy, lower back pain, and Hepatitis C. On April 18, 2011, Gonzalez appeared *pro se* for a

hearing before ALJ Curtis Axelsen. On July 29, 2011, the ALJ denied Gonzalez's application,

finding him not disabled under the Act. On November 1, 2011, the Appeals Council granted Gonzalez's request for review, vacated the ALJ's decision "under the substantial evidence provision" of the Act, and remanded the case for further proceedings. (AR 77.) The Appeals Council's remand was based on their findings that (1) the ALJ's decision was "unclear regarding the claimant's residual functional capacity" ("RFC") because the RFC contained no mental limitations despite the ALJ's finding that Gonzalez had the severe mental impairment of depression, and (2) Gonzalez's mental limitations required a vocational expert's testimony on how Gonzalez's impairment affects his occupational base, but the ALJ failed to consult a vocational expert.

Accordingly, on January 18, 2012, Gonzalez appeared *pro se* for his second hearing, this time before ALJ Zachary Weiss. After the hearing, the ALJ sought the expertise of vocational expert Raymond E. Cestar via interrogatories. On November 30, 2012, the ALJ denied Gonzalez's application, finding him not disabled under the Act. On June 17, 2014, the Appeals Council denied Gonzalez's request for review, thereby rendering the Commissioner's decision final.

On August 6, 2014, Gonzalez filed this action challenging the denial of his application for disability benefits. On December 23, 2014, the Commissioner filed a motion for judgment on the pleadings, with supporting memorandum of law. On January 5, 2015, the Court issued an Order directing Gonzalez to file a response by January 22, 2015, and the Commissioner to file a reply, if any, by February 5, 2015. On January 20, 2015, Gonzalez filed an affirmation in opposition to the Commissioner's motion for judgment on the pleadings. The Commissioner filed no reply, and the matter is considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

Gonzalez was born on August 24, 1962, and married his wife Cynthia Gonzalez on February 14, 2002. On a Disability Report – Adult – Form SSA – 3368, dated February 18, 2010, Gonzalez informed the interviewer that they live at 2728 Kingsbridge Terrace, Apt. 1, Bronx, New York, 10463. Gonzalez suffers from HIV, neuropathy, lower back pain and Hepatitis C. He takes Dronabinol for weight gain, Hydrocodone with APAP for pain, a multivitamin, Norvir and Reyatz for HIV, and Zolpidem for sleep.

Gonzalez indicated that he completed the 10th grade. From 1996 to 1998, he received inventory at a recycling plant, for which he used machines, tools, and equipment but did not use technical knowledge or skills. He did "writing, complete reports, or perform any duties like this," but did not supervise others. (AR 160-61.) He lifted cases of cans and bottles frequently, the heaviest of which weighed 20 to 25 pounds. He stopped working on November 1, 1998.

Gonzalez completed a New York State Office of Temporary Disability Assistance Division of Disability Determination Form on March 10, 2010. Gonzalez reported that he was released from prison in December 2009, after which he attended daily group meetings at the Osborne Association and reported to parole once a week. He goes outside every day and does not have a driver's license. He is able to walk two blocks before he needs to stop, rests for five to ten minutes, and then continue. His hobbies and interest include reading, watching TV, and spending time with his wife, members of his support group, and a few friends. He does not have problems getting along with family, friends, or neighbors.

He reported that he can follow spoken and written instructions, finish what he starts, does not have problems paying attention, but does have trouble remembering things. He does not need

help taking care of his hair, feeding himself, using the toilet, or grooming, and does not need reminders to take medicine. He is able to manage his own savings account and use a checkbook. He is able to bath himself but his leg pain prevents him from bending over at times. He described having "stabbing" pain in both of his legs and that he can no longer lift items or stand for long periods of time. (AR 170, 175.) He usually eats at fast food restaurants due to his "inability to stand for long periods of time." (Id.) If he does prepare a meal, it takes two hours because he has to rest and take breaks. He cannot perform house or yard work that requires heavy lifting or standing for long periods of time. Due to his medical conditions, he indicated that he is no longer able to work, exercise or be mobile in the way he used to be. He takes medication to help him sleep.

## I.     Relevant Medical History

### A.      New York State Department of Correctional Services

Medical records from 2009, when Gonzalez was incarcerated at the Wallkill and Queensboro Correctional Facilities, indicate that Gonzalez has HIV, Hepatitis C, for which he refused prescriptions, and neuropathy; all are chronic conditions. He was able to self-administer drugs, walk without assistance, live alone, and exhibited appropriate behavior. X-rays showed that Gonzalez's heart and lungs appeared normal, and that he had mild scoliosis. On September 6, 2009, Gonzalez's CD4 count was 510, and on December 21, 2009, it was 526.[1]

---

[1] The terms "CD4 cell" and "T-cell" both refer to the same type of cell, a CD4 T lymphocyte cell. See HIV-AIDS Basics, U.S. Dep't of Health & Human Services, available at https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last visited on March 11, 2015). See also 20 C.F.R. Pt. 404, subpt. P, app'x 1, § 14.00(F)(2). A normal CD4 count ranges from 500-1,000 cells/mm in adults. Id. A CD4 count of fewer than 200 cells/mm is a likely indicator that HIV has progressed to stage 3 infection, or AIDS. Id.

**B.      Treating Physicians**

**1.      Dr. Michael Pierce, Internal Medicine**

After his release from prison, Gonzalez was treated at All Med Medical and Rehabilitation of New York ("All Med") from January 2010 through January 2012. On January 21, 2010, All Med diagnosed Gonzalez with HIV, HIV neuropathy, HIV wasting syndrome,[2] HCV coinfection,[3] oral thrush, and opioid dependence in remission.[4] Gonzalez measured five feet four inches tall and weighed 149 pounds. He denied having depressive symptoms or anhedonia but described having insomnia. He complained of chronic lower back pain and a poor appetite.

The All Med report indicates that Gonzalez was born on March 26, 1962, and was 47 years old at the time. All Med determined that he had been the victim of domestic violence between ages 11-12. He had been married to his wife for eight years, was literate, and had completed a 10th grade education. He last used heroin in 2006, used cocaine for 20 years, and had never participated in a drug rehabilitation program. He was diagnosed with HIV in 1997, and stopped working the same year due to "LE pain." (AR 293.) All Med offered Gonzalez treatment for his Hepatitis C coinfection but he refused it. All Med advised him to stop smoking and to attend adherence counseling, provided him with HIV patient education, reviewed his

---

[2] "Wasting syndrome" is the "involuntary loss of more than 10% of your body weight, in addition to more than 30 days of either diarrhea or weakness and fever," due largely to loss of muscle mass. See HIV-AIDS Basics, U.S. Dep't of Health & Human Services, available at https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/hiv-in-your-body/physical-changes/ (last visited March 11, 2015).

[3] "HCV" refers to the Hepatitis C virus. See Hepatitis C for Health Professionals, U.S. Centers for Disease Control and Prevention, available at http://www.cdc.gov/hepatitis/HCV/ (last visited on March 11, 2015). "When someone is infected with both HIV and viral hepatitis, we say that they are 'coinfected.'" See Staying Healthy with HIV-AIDS, Potential Related Health Problems: Hepatitis, U.S. Dep't of Health & Human Services, available at https://www.aids.gov/hiv-aids-basics/staying-healthy-with-hiv-aids/potential-related-health-problems/hepatitis/ (last visited March 11, 2015).

[4] It is not clear which doctor Gonzalez saw on this visit and which doctor filled out this All Med report.

prescriptions, and recommended consultations with mental health, dental, and ophthalmology practitioners.

On February 25, 2010, Gonzalez returned to All Med and was seen by internist Dr. Michael Pierce. Dr. Pierce found that Gonzalez had been 100% adherent for the past three days with his HIV medication regime, and that his CD4 count was 419. Dr. Pierce found that Gonzalez had HIV neuropathy and was "virologically unstable," so placed him on a new ARV regimen, including Atripla. At his next April 8, 2010 appointment, Gonzalez reported being 0% Atripla adherent over the past three days and weighed 137 pounds. He described feeling "stressed out" over his medications and that "there are too many pills." (AR 343.) His CD4 count was 419, and Dr. Pierce placed him on a new regimen requiring only one dose daily. On April 28, 2010, Gonzalez was seen by Dr. Edward Fruitman at All Med. Gonzalez complained of severe insomnia, and Dr. Fruitman modified his Ambien prescription.

On May 4, 2010, Gonzalez reported being 100% Atripla adherent in the past three days and had gained weight. He described having sleep disturbances and a recent increase in anxiety. Dr. Pierce noted that the ARV regimen had been successfully initiated and Gonzalez was tolerating it well. At his June 4 and July 8, 2010 appointments, Gonzalez's condition was unchanged. On August 9, 2010, his condition was unchanged except that his CD4 count had dropped to 234. On September 7, 2010, Gonzalez reported that he was 33% Atripla adherent over the past three days and complained of a low appetite. His CD4 count was 234. On October 8, 2010, Gonzalez reported being 100% Atripla adherent, and his condition was otherwise unchanged.

On October 22, 2010, Gonzalez had gained six pounds, was 100% Atripla adherent, and complained of lower back and bilateral leg pain that his current pain medication was not helping.

His CD4 count remained at 234. Dr. Pierce gave Gonzalez a testosterone shot. On November 3, 2010, Gonzales reported that he was 100% Atripla adherent, he was eating well with the help of his Marinol prescription, but he was not sleeping well and requested more Ambien. He reported that he saw an ophthalmologist three months ago, planned to see a dentist, and had missed his psychiatrist appointment but would reschedule. He reported that he was still smoking and was not ready to stop because his wife smokes. His CD4 count was 273. On November 9, 2010, Gonzalez's condition was largely unchanged, but he received another testosterone shot, and Dr. Pierce diagnosed Gonzalez with hypogonadism. Gonzalez missed his psychiatry appointment again and planned to reschedule. At his appointments on November 30 and December 28, 2010, his conditions were unchanged.

On January 24, 2011, Gonzalez reported that he was 100% Atripla adherent in the past three days, his appetite was improving, and he was sleeping "so-so." (AR 326.) He reported having seen a dentist and ophthalmologist. On February 24, 2011, his condition was unchanged except that his CD4 count was 285. On March 24, 2011, he complained of flu-like symptoms. He reported that his appetite was improving, Ambien was "helping somewhat" with sleep, and he was "feeling ok overall." (AR 324.) He was 100% Atripla adherent over the past three days, and his CD4 count was 289.

On April 24, 2011, Gonzalez reported that he was 100% Atripla adherent, had a good appetite, and although Ambien helped him to fall asleep, he still woke up several times during the night. He complained of lower back pain that had been more intense over the past four weeks and mild tenderness of his lower back paravertebral muscle, on his left side, when he walks. On May 25, 2011, Gonzalez resisted having lab work done and admitted that he had not been taking Atripla and could do better with adherence. Otherwise, he reported eating well, sleeping better

with Ambien, and "feeling well overall" on the Remeron prescribed by the psychiatrist.
(AR 321.) On June 24, 2011, Gonzalez complained of having "fairly intense" pain and reported
that he went to the Bronx Lebanon Hospital Emergency Room on June 19, 2011. (AR 320.)
There he learned he had a shingles rash, and he was admitted for one day due to fever.

 On July 28, 2011, Gonzalez's shingles had resolved, but he had residual pain and scarring
from it. He reported being Atripla adherent and his CD4 count was 248. Otherwise, he reported
feeling well overall, eating well, and sleeping better. Dr. Pierce noted that Gonzalez should
continue taking Atripla for HIV and needs additional adherence counseling, "[illegible]" for
Hepatitis C, Flexeril for chronic pain, Ambien for insomnia, and Remeron for depression.
(AR 319.) On August 26, 2011, Gonzalez complained of chronic pain in both feet, which he
described as 6/10. His CD4 count was 221. Treatment notes from his visit on September 22,
2011 are largely illegible.

 On November 3, 2011, Gonzalez reported being 0% Atripla adherent in the past three
days, that he had a good appetite, and that his sleep had decreased. His CD4 count was 221 and
he weighed 144 pounds. Gonzalez again refused serology collection. His medications were listed
as Ambien, Flexeril, Oxandrolone, and Percocet.[5] On December 6, 2011, Gonzalez weighed 152
pounds and reported having a good appetite. Otherwise, his condition was unchanged: his CD4
count was 221 and he was still "virologically unstable." (AR 311-13.)

 On January 3, 2012, Gonzalez weighed 155 pounds and reported that his appetite was
good and he was gaining weight. He said his sleep was fair, and Dr. Pierce recommended that he
follow-up with a psychiatrist. Dr. Pierce noted that Gonzalez was "HIV stable." (AR 308-09.)

---

[5] Oxandrolone is used to cause weight gain in patients who have lost too much weight due to surgery,
injury, or long lasting infections, or who are very underweight for unknown reasons. See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604024.html#why (last visited March 11, 2015).

### 2.      Dr. Kingsley Nwokeji, Psychiatry

On May 13, 2011 through February 16, 2012, Gonzalez saw psychiatrist Dr. Kingsley

Nwokeji at Clay Avenue Health Center. At his May 13, 2011 visit, the reason for his visit was

listed as: depression, poor sleep, appetite, and anhedonia. He denied suicidal and homicidal

ideation. He explained that when he gets angry, he walks to feel better. His appearance was

appropriate, he was oriented to three spheres, his speech was clear, and his behavior was

unremarkable. His memory was intact, his attitude was cooperative, and his insight, judgment,

and impulse control were good. His affect was constricted and his intellect was average. His self-

perception was realistic and his thought processes were logical. Dr. Nwokeji diagnosed him with

a Mood Disorder (296.90) and a Global Assessment of Functioning ("GAF") of 40.[6]

On June 24, 2011, Dr. Nwokeji reported that Gonzalez had enjoyed minimal

improvements in his depression and that he was compliant with his medication. His condition

was largely unchanged but had slightly improved: Dr. Nwokeji noted that Gonzalez's mood was

euthymic. Dr. Nwokeji noted a GAF of 40. On July 22 and September 1, 2011, Gonzalez's

condition was largely unchanged. On December 1, 2011, Gonzalez's condition was the same, but

Dr. Nwokeji noted that Gonzalez had enjoyed moderate improvement in response to his

depression medication. On January 19 and February 16, 2012, Gonzalez presented similarly but

Xanax was prescribed in addition to Remeron.

---

[6] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000) ("DSM-IV")). A GAF between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV 30-32. A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. The Fifth Edition of the DSM has discarded the use of GAF Scores. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V"). The DSM IV, however, was in effect at the time of Gonzalez's treatment.

### C.    Consultative Physicians

#### 1.    Dr. Dipti Joshi, Internal Medicine

On March 17, 2010, Gonzalez saw consultative examiner Dr. Dipti Joshi at Industrial

Medicine Associates, P.C. in the Bronx for an internal medical exam. Dr. Joshi reported that

Gonzalez has a history of HIV, which was diagnosed in 1997, had a CD4 count of 400, and his

only reported symptom was loss of appetite. Gonzalez reported that he has had neuropathy in his

lower extremities since 1999. He described the pain as 5/10, very sharp, better with medication,

and worse with standing and walking. He described his lower back pain as 7/10, sharp and

radiating, better with medication, and worse when lying down. He has had depression and

insomnia since 2006, but has no homicidal or suicidal ideations. Gonzalez has Hepatitis C but

denied symptoms, did not have cirrhosis, and declined treatment. He used heroin but stopped in

2005 and does not consume alcohol. He smokes ten cigarettes per day.

Gonzalez reported that he lives with his wife. He does cleaning and laundry once a week

but has trouble cooking because of the pain in his lower extremities. He showers, bathes, and

dresses himself daily. He watches TV, listens to the radio, reads, and socializes with friends.

Dr. Joshi found that Gonzalez's gait was normal, and he appeared to be in no acute

distress, could walk without difficulty, squat fully, used no assistance devices, needed no help

getting on and off the exam table, and was able to rise from his chair without difficulty.

Gonzalez had 5/5 grip strength bilaterally, 5/5 upper and lower extremities strength, and no

swelling or muscle atrophy. Dr. Joshi found that Gonzalez's cervical and lumbar spine showed

"full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally."

(AR 223.) Dr. Joshi ordered an x-ray of Gonzalez's lumbosacral spine, which showed "mild

degenerative spondylosis at L1-L2," "no compression fracture," with an impression of

degenerative changes. (AR 223, 225.) He listed Gonzalez's medications as "Reyatz, Norvir, Truvada, Ziagen, Hydrocodone, [illegible], Zolpidem, [and] multivitamins." (AR 226-29.) Dr. Joshi diagnosed Gonzalez with HIV, Hepatitis C, HIV with neuropathy, depression, insomnia, lower back pain, loss of appetite, and "thrush for which he should be evaluated." (Id.) He deemed Gonzalez's prognosis to be fair and indicated that "at this time, [Gonzalez] has no medical limitations." (Id.)

### 2.    Dr. Herb Meadow, Psychiatry

On March 31, 2010, Gonzalez saw consultative psychiatrist Dr. Herb Meadow at Industrial Medicine Associates, P.C. in the Bronx. Gonzalez travelled to the appointment on public transportation and indicated that he can travel alone. He lives with his wife and has a 23 year old daughter who lives elsewhere. He completed the tenth grade in regular education classes and can read. He has spent 15 years of his life incarcerated for drug-related charges and was last released in January 2010. He last worked in 1996 but stopped due to back problems. He used cocaine and heroin until 2004. He has no history of psychiatric hospitalizations or treatment and has never been hospitalized for medical reasons. Dr. Meadow reported that Gonzalez is HIV positive, and has Hepatitis C, peripheral neuropathy, and back pain. His medications include Norvir, Truvada, Reyatz, Hydrocodone/APAP, and Zolpidem.

In terms of "functioning," Dr. Meadow reported that Gonzalez has difficulty falling asleep, his appetite fluctuates, and that he has lost six pounds in the last year. Gonzalez had symptoms of depression, dysphoric moods, irritability, low energy, diminished self-esteem, and difficulty concentrating. He has never been suicidal and denied excessive anxiety, panic attacks, manic symptoms, thought disorders, and cognitive deficits. He takes care of his personal

hygiene, helps with household chores, and socializes with friends and family. He spends time listening to music, watching TV, and reading.

Dr. Meadow found that Gonzalez's manner of relating was adequate, his eye contact and affect were appropriate, and his demeanor was cooperative. He appeared his stated age, dressed appropriately, and was neat, casual, and well-groomed. His speech was clear, fluent, expressive, and receptive. His thought processes were coherent and goal-directed with no hallucinations, delusions, or paranoia, and he was oriented to three spheres. His insight and judgment were fair, and his general fund of information was appropriate to his experiences. His recent and remote memory skills also were intact: although he was able to repeat four numbers going forward, however, he got confused when asked to count in reverse order. His attention and concentration were otherwise adequate, gauged by counting, calculations, and counting serially in 3s from 20.

Dr. Meadow diagnosed Gonzalez with depressive disorder NOS, and cocaine and heroin use/dependence in remission. He also found that Gonzalez suffers from HIV, Hepatitis C, peripheral neuropathy, and back pain. Although the "results of the examination appear to be consistent with psychiatric problems," Dr. Meadow found that his problems do "not appear to be significant enough to interfere with [his] ability to function on a daily basis." (AR 228.) Dr. Meadow determined that Gonzalez's prognosis was fair, and that he "would be able to perform all tasks necessary for vocational functioning." (AR 226-29.)

### 3.     CT Scan

Gonzalez was referred for a CT scan of the abdomen and pelvis to rule out abdominal mass. The report, dated September 14, 2011, signed by Dr. Russell S. Golkow, lists "Antonios Vera" as the referring physician. The report indicates that Gonzalez had "no focal or multifocal hepatic abnormalities," normal "gallbladder and bile ducts," "mild hepatomegaly, the liver

diameter at 16.5 cm and mild splenomegaly." (AR 346.) Dr. Golkow concluded that Gonzalez

had "mild hepatosplenomegaly," "at least mild retroperitoneal adenopathy about the aorta and

vena cava from the level of the renal hila down with scattered sites of mild iliac and bilateral

inguinal adenopathy," "lymphnodes are reasonably well encapsulated, of indeterminate

etiology," and "mild aortoiliac atherosclerotic calcification." (AR 347.)

      **D.**    **Non-Examining Physicians**

On April 7, 2010, Dr. R. Altmansberger, a state agency non-examining review

psychologist, completed various forms based on a review of Gonzalez's medical record. Using a

Psychiatric Review Technique ("PRT") form and assessing for the period from August 1, 1997

to March 31, 1998, Dr. Altmansberger determined that there was insufficient evidence to

conclude whether Gonzalez had any impairment. Using a PRT form and assessing through April

7, 2010, the date of the form, Dr. Altmansberger diagnosed Gonzalez with depression not

otherwise specified ("NOS").[7] For substance addiction disorders, Dr. Altmansberger found that

Gonzalez's impairments do not precisely satisfy the diagnostic criteria but that he suffers from

cocaine/heroin dependence in remission.[8] Dr. Altmansberger concluded that Gonzalez's

impairments did not satisfy the "B" criteria of Listing § 12.04: Gonzalez had mild restriction in

activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties

in maintaining concentration, persistence or pace, and no episodes of deterioration. Gonzalez

also did not satisfy the "C" criteria because his impairments did not cause more than a minimal

limitation of ability to do any basic work activity coupled with repeated episodes of

---

[7] Depression NOS is used to characterize "[a] medically determinable impairment [that] is present [but] does not precisely satisfy the diagnostic criteria" for affective disorders. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04. The paragraph B and paragraph C criteria are explored in greater detail in Part II of the Discussion.

[8] See 20 C.F.R., Pt. 404, subpt. P, app'x 1 § 12.09.

decompensation, a residual disease, or an inability to function outside a highly supportive living arrangement.

On the same day, April 7, 2010, Dr. Altmansberger also completed a Mental Residual Functional Capacity Assessment. Gonzalez's primary diagnosis was depression. Dr. Altmansberger considered that Gonzalez had no history of psychiatric hospitalizations or treatment, but that Gonzalez described having a depressed mood and insomnia. Gonzalez used heroin and cocaine but stopped in 2004. Based on a record review, Dr. Altmansberger found that Gonzalez's speech was fluent and clear, his affect was appropriate, he was oriented to three spheres, his remote and recent memory were intact, his judgment and insight were fair, and his cognitive functioning was average. Gonzalez was not significantly limited in understanding and memory (ability to remember locations and work-life procedures, understand short and simple instructions, and remember detailed instructions), and not significantly limited in social interaction. Gonzalez was not significantly limited in most areas of sustained concentration and persistence, except that he was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Regarding his ability to adapt, Gonzalez was moderately limited in his ability to respond appropriately to changes in the work setting and not significantly limited in his ability to be aware of normal hazards and take appropriate precautions. Dr. Altmansberger concluded that Gonzalez has "no more than moderate limitations." (AR 266.)

Finally, "Angeline, S" completed a Physical Residual Functional Capacity Assessment. Gonzalez's primary diagnosis was HIV, and the date he was last insured was March 31, 1998. Angeline noted that Gonzalez is a 47-year-old male alleging HIV neuropathy, lower back pain, and Hepatitis C, with no alleged symptoms other than loss of appetite. Angeline found that his

strength, gait, and reflexes were normal, with no joint swelling, muscle atrophy or weakness. No postural, manipulative, visual, communicative, or environmental limitations were established. Gonzalez could occasionally lift and/or carry (including upward pulling) up to 20 pounds, frequently lift and/or carry (including upward pulling) up to 10 pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday, sit (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull (including operation of hand and/or foot controls) with no additional limitations.

## II.   Administrative Hearings

### A.   April 18, 2011

On April 18, 2011, Gonzalez appeared at a hearing before ALJ Axelsen and waived his right to counsel. He was 48 years old and had traveled to the hearing with his wife. They live in a first floor studio apartment.

He testified that he was not employed and had last worked in 1997 at a recycling company. At that job, he lifted and carried "light stuff" and was standing all day. (AR 42.) He has not been able to work since that job due to lower back pain that he has suffered the last few years. It is a "sharp pain" that radiates from his back and waist down. (AR 42-43.) On a scale of one to ten, the worst day "is at least eight," and he has the pain "at least five days" a week. (AR 42, 44.) Some days, the pain makes him "just want to lay down in the bed. Don't want to even get up." (AR 44.) The pain was not caused by an accident. He has had numbness and sharp pain in both of his legs since 2006 and has been diagnosed with neuropathy. The impairments prevent him from working because he "get[s] a lot of pain" when he stands on his legs: "I'll stay on my legs two or three hours a day and I got to sit down and relax." (AR 50.) But the most that

he can sit down for is 45 minutes or an hour. He cannot sit down for six hours because of his back, but would need to "[s]it down, stand up." (AR 54.)

Gonzalez's neuropathy is related to his HIV status, for which he sees Dr. Pierce. He takes Tryptyline for HIV, which causes him to have "crazy dreams." (AR 53.) He also has Hepatitis C. He used to take Hydrocodeine and now takes Percocet for the pain. Gonzalez testified that he had been seeing "a psych for depression" but had stopped because the appointments were "too early in the morning." (AR 49.) In prison, he also received medications for his emotional problems. He takes Ambien for his insomnia. He sometimes goes to bed at 2:00 or 3:00 in the morning because he cannot sleep and has trouble getting up in the morning.

On an average day, Gonzalez gets up, showers, and watches TV. He used to play sports, but he had to stop in 2006 because of the pain. He helps with light chores around the house, and his wife does chores with him. Gonzalez's wife testified that she cleans the kitchen, and he will clean and scrub the bathroom and bathtub. She also has HIV. The couple goes outside for walks together.

**B.     January 18, 2012**

On January 18, 2012, following the Appeals Council's remand of ALJ Axelsen's decision, Gonzalez appeared unrepresented for a hearing before ALJ Weiss.

Gonzalez testified that he sees a psychiatrist Dr. Kinglsey and takes medication for his depression. He also sees a primary care doctor, "Dr. Vaez [phonetic]," for his HIV. (AR 31.) He is financially supported by his wife, who has no income other than SSI benefits. He gets food stamps and government assistance for rent but gets no financial assistance otherwise.

Gonzalez testified: on an average day, "I go to the gym and work out. Stay home, watch TV. I read. I listen to music." (AR 33.) He goes to the gym every other day and does calisthenics,

pushups, pull ups, and lifts, but he does not lift weights. He does 10 sets of 20 pushups and does five pull ups.

ALJ Weiss explained to Gonzalez that Weiss would obtain a vocational opinion and send it to Gonzalez and then adjourned the hearing.

### C.    Vocational Expert Interrogatories

On June 2, 2012, ALJ Weiss sought vocational expert Raymond E. Cestar's opinion via letter and a set of interrogatories. Cestar answered the interrogatories on June 7, 2012. Cestar affirmed that he was impartial and that there was sufficient evidence to allow him to form an opinion on Gonzalez's vocational status. He found that Gonzalez had no work experience in the last 15 years.

The interrogatories first posed the following hypothetical: assume that an individual was born on August 24, 1964, completed tenth grade, is able to communicate, read, and write in English, has had no work experience for the past 15 years, is capable of the full range of light and sedentary work and that this individual is limited to routine, repetitive tasks. Cestar opined that the hypothetical individual could not perform any of Gonzalez's past jobs. That individual could, however, perform unskilled occupations with jobs that exist in the national economy: Cleaner/Housekeeping (DOT 323.687-014, light exertion level, SVP 2, with 30,000 jobs available in New York City ("NYC") and 800,000 nationally), Folder – laundry and related (DOT 369.687-018, light exertion level, SVP 2, with 6,000 jobs available in NYC and 390,000 nationally), Bagger (DOT 920.687-018, light exertion level, SVP 1, with 15,000 jobs available in NYC and 625,000 nationally), Clerical Worker (DOT 209.587-010, sedentary exertion level, SVP 2, with 2,300 jobs available in NYC and 19,000 nationally), Call Out Operator (DOT 237.367-014, sedentary exertion level, SVP 2, with 1,000 jobs available in NYC and 20,000

nationally), and Sorter (DOT 521.687-086, sedentary exertion level, SVP 2, with no jobs available in NYC but 4,800 jobs available nationally).[9]

The interrogatories' next hypothetical posited: assume the same facts as the first hypothetical except the individual is capable of the full range of light and sedentary work *but* is limited to routine, repetitive tasks and low stress jobs, defined as ones that require only occasional decision making and no changes in work setting. Cestar opined that the hypothetical individual could not perform any of Gonzalez's past jobs. That individual could, however, perform unskilled occupations with jobs that exist in the national economy, including the same ones listed for the first hypothetical.

A third hypothetical posited: assume the same facts as the first hypothetical except the individual is capable of the full range of light and sedentary work but is limited to routine, repetitive tasks and low stress jobs, defined as ones that require only occasional decision making, no changes in work setting, *and* only occasional contact with the public and co-workers. Cestar opined that the hypothetical individual could not perform any of Gonzalez's past jobs. That individual could, however, perform unskilled occupations with jobs that exist in the national economy, including the same ones listed for the first hypothetical.

## III.    The ALJ's Determination

In his November 30, 2012 decision, the ALJ found that Gonzalez has not been under a disability within the meaning of the Act since August 1, 1997, and denied his DIB and SSI applications. The ALJ initially found that Gonzalez acquired sufficient quarters of cover to

---

[9] The Dictionary of Occupational Titles (the "DOT") defines "Specific Vocational Preparation" (the "SVP") as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles Appendix C, underline available at
http://www.occupationalinfo.org/appendxc_1.html (last visited March 11, 2015).

remain insured through March 31, 1998, and thus had to establish disability on or before that date in order to be entitled to DIB.

At step one, the ALJ determined that Gonzalez has not engaged in substantial gainful activity since August 1, 1997, the alleged onset date of his disabilities, pursuant to 20 C.F.R. §§ 404.1571 *et seq.*, 416.971. At step two, the ALJ found that the record contains no evidence that Gonzalez experienced any severe medically determinable impairment that imposed significant vocationally relevant limitations before Gonzalez's last insured date, or March 31, 1998. More recently, however, Gonzalez had developed the following severe impairments, pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c): HIV infection with some reported neuropathy, Hepatitis C, lower back pain, and depression.

At step three, the ALJ determined that Gonzalez's combination of impairments does not meet or medically equal the severity of the "Listings" in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ first considered Gonzalez's HIV and noted that, according to consultative internist Dr. Joshi, there is no evidence of secondary infections or problems that cause significant vocational limitations other than neuropathy. Gonzalez's range of motion was good, and an x-ray ordered of his lumbar spine showed only mild spondylosis at the L1-L2. The ALJ also considered that Gonzalez has not received treatment for his Hepatitis C separate from his treatment for HIV.

Next, the ALJ determined that Gonzalez's impairments do not meet or medically equal Listing § 12.04 (affective disorder). In reviewing the "paragraph B" criteria, the ALJ first determined that Gonzalez has mild restrictions in activities of daily living. This was based on Gonzalez's stable living situation and his long term relationship with his wife. Second, he determined that Gonzalez has moderate difficulties in social functioning. The ALJ based this on

the lengthy amount of time that Gonzalez has spent in jail. Third, he determined that Gonzalez has moderate difficulties with regards to concentration, persistence, or pace. The ALJ based this on the report of consultative psychiatrist Dr. Meadow, who found Gonzalez's cognitive capabilities adequate, and on Gonzalez's own reporting that he suffers from depression. Fourth, the ALJ determined that Gonzalez had no episodes of decompensation of extended duration. As a result, Gonzalez does not satisfy the "paragraph B" criteria. The ALJ also determined that Gonzalez does not satisfy the "paragraph C" criteria.

Before continuing to step four, the ALJ determined that Gonzalez has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that he is limited to low-stress jobs that require nothing more complicated than routine, repetitive tasks, and no more than occasional decision making, and that do not involve any changes in the work setting. In reaching that determination, the ALJ first considered treatment notes from the Department of Correctional Services, dated September 4 through 21, 2009, and concluded that Gonzalez did not experience or exhibit any significant abnormalities during that time. Treatment notes from All Med, where Gonzalez saw his treating physician Dr. Pierce, dated January 21, 2010, also indicate that Gonzalez denied depression or anhedonia. When consultative internist Dr. Joshi examined Gonzalez on March 17, 2010, he found no physical limitations and administered a lumbar x-ray, which showed mild spondylosis at the L1-L2. Two weeks later, on March 31, 2010, consultative psychiatrist Dr. Meadow found that Gonzalez had not had any psychiatric treatment since leaving prison and Gonzalez's depression was not causing any significant impact on his ability to work. Dr. Meadow also noted that Gonzalez's heroin and cocaine abuse was in remission.

The ALJ next considered the opinions of Gonzalez's treating psychiatrist Dr. Nwokeji. On May 13, 2011, Dr. Nwokeji diagnosed Gonzalez with a mood disorder based on his

constricted affect. The ALJ noted that although Dr. Nwokeji did not find any significant

cognitive limitations, he assigned Gonzalez a GAF of 40 based on his emotional state. During

seven visits over the next nine months, Dr. Nwokeji assigned the same GAF but continued to

find no significant limitations. Dr. Nwokeji prescribed Remeron, increasing the dosage in

December 2011, and added Xanax in early 2012. The ALJ concluded that Dr. Nwokeji's

assignment of a 40 GAF score was limited to his initial appointment only, on May 13, 2011, and

not subsequent appointments.

The ALJ also noted that the All Med treatment notes, dated December 6, 2001, and

January 3, 2012, did not mention Gonzalez's depression, although the ALJ recognized that

Gonzalez was there for physical ailments. The ALJ noted that on May 10, 2010, Gonzalez

complained primarily of an inability to stand for long periods of time and carry heavy objects,

and indicated that he no longer exercised or played sports to the extent he had in the past.[10] But

he did not mention his depression and did not resume treatment for depression until 14 months

later.

Based on the evidence, the ALJ found Gonzalez's allegations believable but did not think

an inability to lift and carry heavy objects, coupled with an inability to stand for very long

periods of time, rendered him disabled. The ALJ also acknowledged that Gonzalez receives

psychotropic medications to treat his depression and takes that medication as prescribed. He

concluded that the record does not demonstrate that Gonzalez suffers limitations to his cognitive

capability because of his mood disorder. Ultimately, the ALJ also determined that although

---

[10] No reports in the record are dated May 10, 2010. After reviewing the record, the Court believes that the ALJ was referring to the March 10, 2010 New York State Office of Temporary Disability Assistance Division of Disability Determination Form that Gonzalez completed, which includes the complaints to which the ALJ refers. (AR 166-77.) The date also corresponds with the ALJ's statement that Gonzalez did not seek psychiatric treatment for another 14 months, as Gonzalez saw treating psychiatrist Dr. Nwokeji for the first time on May 13, 2011.

Gonzalez's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Gonzalez's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent that they are inconsistent with the above RFC assessment.

At step four, the ALJ determined that based on Gonzalez's RFC, he is incapable of performing past relevant work as a receiving and inventory clerk, which requires people to lift up to 50 pounds and follow complicated instructions. At step five, the ALJ considered whether Gonzalez could make a successful adjustment to other work based on his RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines and the vocational expert's interrogatories. The ALJ determined that Gonzalez fits into the 18-49 age group, has a marginal education, is able to communicate in English, and his past relevant work is unskilled. Because Gonzalez's ability to perform unskilled, light work is impeded by additional limitations, the ALJ consulted the opinion of vocational expert Cestar. Cestar opined that given Gonzalez's additional limitations, Gonzalez would still be able to perform the requirements of occupations such as Cleaner/Housekeeping, Folder, Clerical Worker, Call Operator, or Sorter. The ALJ determined that Cestar's opinion was consistent with the DOT, pursuant to Social Security Ruling ("SSR") 00-4p. SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). As a result, the ALJ concluded that Gonzalez is not under a disability, as defined in the Act, and is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

## DISCUSSION

### I.      Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if,

from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v.

Astrue, 569 F.3d 108, 110 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir.

1990) ("Cruz I")). "The Act must be liberally applied, for it is a remedial statute intended to

include not exclude." Cruz I, 912 F.2d at 11. This is particularly true for *pro se* claimants, who

"are entitled to a liberal construction of their pleadings, which should be read to raise the

strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001)

(citation and quotations omitted). See also Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL

78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating *pro se* standard in reviewing denial of

disability benefits).

     Though generally entitled to deference, an ALJ's disability determination must be

reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See

Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a

district court, the ALJ must clearly state the legal rules he applies and the weight he accords the

evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y.

August 21, 2012) ("Rivera I") (citation omitted). Without doing so, the ALJ deprives the Court

of the ability to determine accurately whether his opinion is supported by substantial evidence

and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning,

remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe

that the crucial factors in any determination must be set forth with sufficient specificity to enable

us to decide whether the determination is supported by substantial evidence.").

## II.    Definition of Disability

     A claimant is disabled under the Act if he demonstrates an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A

determinable physical or mental impairment is defined as one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be

determined to be disabled only if the impairments are "of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage

in any other kind of substantial gainful work which exists in the national economy . . . ." 42

U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration ("SSA") has

established a five-step sequential evaluation process when making disability determinations. See

20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not,
> the Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R.
> Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable
> to perform her past work, the burden then shifts to the Commissioner
> to determine whether there is other work which the claimant could
> perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the

burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is

only after the claimant proves that she cannot return to prior work that the burden shifts to the

Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); Melville, 198 F.3d at 51.

If an impairment is found to be "severe" at step two, the ALJ looks to 20 C.F.R. Part 404, Subpart P, Appendix 1 to determine if it qualifies as a listed impairment at step three. 20 C.F.R. § 404.1520a(d)(2). The regulations provide additional guidance for evaluating mental impairments. 20 C.F.R. § 404.1520a(c)(1). Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). For mental disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or the "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B). The first three are rated on a "five-point scale": none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area – episodes of decompensation – is rated on a "four-point scale": none, one or two, three, and four or more. Id. The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B).

**III.    Analysis**

On appeal, Gonzalez argues that the ALJ's decision was in error because he still has "a lot of medical problems" and is unable to work due to his lower back pain.

The Court finds that the ALJ's determinations at steps one and two are supported by substantial evidence and contain no legal error: the ALJ found that Gonzalez had not been engaged in substantial gainful activity since August 1, 1997, and he does have severe impairments. The ALJ's determinations at steps four and five also are supported by substantial evidence and contain no legal error: the ALJ found that based on Gonzalez's RFC, there are jobs in the regional and national economy which Gonzalez is capable of performing, even though Gonzalez is unable to perform his past relevant work. These steps require no further analysis.

**A.    Substantial Evidence Standard**

**1.    Listing-Level Impairments**

At step three, the ALJ determined that Gonzalez's impairments (HIV with neuropathy, Hepatitis C, lower back pain, and depression) and combination of impairments do not meet or medically equal the severity of the Listings. He did not specifically refer to every relevant listing, but his descriptions of Gonzalez's impairments align with the Listings' requirements. Substantial evidence supports his determination.

The ALJ first considered Gonzalez's HIV status. Listing § 14.00 covers immune system disorders, including HIV. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 14.00. HIV is "characterized by increased susceptibility to opportunistic infections, cancers, or other conditions." Id. at § 14.00(A)(4). An ALJ must consider how the HIV limits a claimant's ability to function, as well as the effects, benefits, and adverse side effects of the medical treatment the claimant receives. Id. at 14.00(G)(1), (2). Here, the ALJ acknowledged that Gonzalez suffers from HIV-related

neuropathy and a Hepatitis C coinfection. Based on consultative internist Dr. Joshi, however, the ALJ concluded that there is no evidence of other secondary infections or problems that inhibit Gonzalez's functioning. The ALJ did not reference Gonzalez's treating physician, Dr. Pierce, nor other documented symptoms that Gonzalez suffers from: namely, wasting syndrome, his difficulties with medication adherence, and, relatedly, his CD4 count, which remained low (in the 200s) throughout his treatment. During Gonzalez's treatment with Dr. Pierce, however, his weight increased and his appetite improved. In Dr. Pierce's last report, he found that Gonzalez's HIV was "stable." (AR 308-09.) The ALJ should have referred to this evidence. But it does not alter the ALJ's conclusion: the substantial evidence supports the ALJ's finding that Gonzalez's HIV status does not meet or medically equal the Listing.

The ALJ next considered Gonzalez's back pain. Listing § 1.04 covers disorders of the spine, including degenerative disc disease. Disorders of the spine require (a) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test," (b) "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging," or (c) "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging . . . resulting in inability to ambulate effectively" Id. at § 1.04(A)-(C). See id. at § 1.00(B)(2)(b) (defining an ability "to ambulate effectively," in part, as being "capable of sustaining a reasonable walking pace over a sufficient distance" and "ability to travel without companion assistance). The ALJ considered Dr. Joshi's opinion that Gonzalez's range of motion was good, and that the lumbar spine x-ray showed no significant problems. Other evidence also supports the finding that Gonzalez does not meet the

severity of the Listing: despite his pain and limitations, he can ambulate effectively, he walks and exercises often, and he does not have the other documented spinal conditions. See, e.g., Paulino v. Colvin, 13 Civ. 3718 (AT)(AJP), 2014 WL 2120544, at *12 (S.D.N.Y. May 13, 2014) ("The evidence clearly showed that Paulino could ambulate effectively – she did not use an assistive device and she carried out routine ambulatory activities such as cleaning, shopping and taking public transportation independently.") (collecting cases).

The ALJ next noted that Gonzalez has declined treatment for Hepatitis C and thus did not consider Hepatitis C as a separate impairment, but rather considered it in conjunction with Gonzalez's HIV only. Even if the ALJ had considered Gonzalez's Hepatitis C as its own impairment, rather than as a coinfection, substantial evidences supports the finding that none of Gonzalez's other symptoms, including the neuropathy, meets or medically equals the Hepatitis C Listing, which is defined by: "[h]emorrhaging from esophageal, gastric, or ectopic varices," requiring hospitalization for transfusion," "spontaneous bacterial peritonitis," "depatorenal syndrome," "hepatopulmonary syndrome, "hepactic encephalopathy," or other symptoms. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 505(A)-(F), 105.00(D)(4)(c), (C)(6). No medical reports indicate liver-related complications, and the CT scan, conducted on September 14, 2011, does not indicate severe liver complications.

Lastly, the ALJ determined that Gonzalez's depression and insomnia do not meet the affective disorders Listing. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00. Affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." Id. at § 12.04. The ALJ considered Gonzalez's stable living situation and relationship with his wife, the social impairments that his prison stay

may have caused, his depression, and consultative psychiatrist Dr. Meadow's finding that

Gonzalez's cognitive capability is adequate. The ALJ concluded that Gonzalez had mild

restrictions in activities of daily living, moderate difficulties in social function, and moderate

difficulties with regards to concentration, persistence, or pace. This finding is supported by

substantial evidence. Reviewing, non-examining physician Dr. Altmansberger also found that

Gonzalez had mild restrictions in daily living and moderate difficulties with concentration,

persistence or pace, although he found that Gonzalez had only mild, not moderate, restrictions in

social functioning. In treating physician Dr. Pierce's reports, Gonzalez described feeling "ok" or

"well overall" and that his sleep was generally improving. (AR 234, 321). Gonzalez also denied

feeling suicidal or homicidal to his treating psychiatrist Dr. Nwokeji, and Dr. Nwokeji found

"moderate improvement" in Gonzalez's depression in response to medication. (AR 367-69.) The

ALJ's conclusion that Gonzalez's depression does not meet the severity of Listing § 12.00 is

supported by substantial evidence.

### 2.    Residual Functional Capacity

An RFC determination indicates "the most [a claimant] can still do despite his

limitations." 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, the ALJ "must first

identify the individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of

20 C.F.R. [§§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013)

("Cichocki I") (per curiam) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). These

functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing,

pulling, or other physical functions; mental abilities such as understanding, remembering,

carrying out instructions, and responding appropriately to supervision; and other abilities that

may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors." Cichocki I, 729 F.3d at 176.

The ALJ found that Gonzalez's RFC allowed him to perform light work, except that he is limited to low-stress jobs that require nothing more complicated than routine, repetitive tasks, and no more than occasional decision making, and that do not involve any changes in the work setting. Substantial evidence supports this RFC.

"Light work" involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arms or leg controls. The full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567; SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). If someone can perform light work, it is presumed that he can also perform sedentary work. 20 C.F.R. § 404.1567(b).

Here, the record confirms that Gonzalez is self-sufficient and can take care of his hygienic needs. He goes outside every day, does laundry once a week, and goes to the gym every other day where he does calisthenics, pushups, and pull-ups. Although Gonzalez testified that he would be unable to sit six hours straight, he stated that he is able to sit down for 45 minutes or one hour and then would need to "[s]it down, stand up." (AR 51, 54.) At his March 17, 2010 consultative appointment with Dr. Joshi, he walked without difficulty, was able to rise from his chair without difficulty, and needed no help getting on and off the exam table. Despite his physical activity, however, he also testified that he cannot do yard work, house cleaning, or cooking that requires heavy lifting or standing for long periods of time. His wife testified,

however, that he cleans the bathroom and bathtub. Gonzalez described to Dr. Joshi that his back pain was 5/10 and his lower back pain was 7/10, sharp and radiating. Dr. Joshi's April 7, 2010 Physical Residual Functional Capacity Assessment acknowledged Gonzalez's limitations and restricted him to occasionally lifting up to 20 pounds and frequently lifting up to 10 pounds, but found him able to stand, walk, or sit for a total of about six hours in an eight hour workday plus normal breaks. The RFC, limiting Gonzalez to light work and sedentary work, which includes normal breaks, reflects Gonzalez's capabilities and limitations.

Substantial evidence also supports a finding that Gonzalez has the mental and cognitive ability reflected by the RFC. Treating psychiatrist Dr. Nwokeji found that Gonzalez was cooperative, had logical thought processes, and had average intellect. Gonzalez told Dr. Nwokeji that when he gets angry, he walks to feel better, which demonstrates that he has coping skills to deal with frustrating situations. He socializes with friends and family and does not have problems interacting with others. He also is able to travel alone and take public transportation. The reports of consultative physician Dr. Meadow and the non-examining physicians substantiate Dr. Nwokeji's findings. Dr. Meadow noted that Gonzalez has difficulty concentrating and low energy. Based on a series of short cognitive tests, Dr. Meadow found that Gonzalez could repeat four numbers going forward but could not repeat the same numbers in reverse order; Gonzalez otherwise performed adequately in the other tests. Dr. Meadow also found that Gonzalez's manner of relating was adequate, his thought processes were coherent, he was well-groomed, and his speech was fluent and expressive. In a Mental Residual Functional Capacity Assessment, Dr. Altmansberger found that Gonzalez was not significantly limited in his ability to remember work-life procedures, understand short and simple instructions, and remember detailed instructions. Gonzalez was moderately limited, however, in his ability to

perform activities within a schedule and respond appropriately to changes in work setting. The ALJ should have more thoroughly supported his opinion, but the RFC takes into account Gonzalez's particular limitations and is supported by substantial evidence.

### 3.    GAF Score

Under the DSM–IV, a GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV 30-32. A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. In 2013, the SSA issued an Administrative Message limiting the use of GAF scores. "At a basic level, the Administration noted that '[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.' See [SSA Message 13066, July 22, 2013]. . . . Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used. Id." Mainella v. Colvin, 13 Civ. 2453 (JG), 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014). SSA guidelines also state that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Med. Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, at *50764-65 (August 21, 2000). See Rivera v. Astrue, 3:10 Civ. 1035 (CSH), 2014 WL 5419529, at *10 (D. Conn. Oct. 22, 2014) ("Rivera II") (citing Mainella, 2014 WL 183957, at *1, 5). Accordingly, "a GAF score – in and of itself – [does not demonstrate] that an impairment significantly interferes with a claimant's ability to work." Parker v. Comm'r of Soc. Sec'y, 2:10 Civ. 0195 (JMC), 2011 WL 1838981, at *6 (D. Vt. May 13, 2011). See also

Schneider v. Colvin, 3:13 Civ. 0790 (MPS), 2014 WL 4269083, at *4, n.5 (D. Conn. Aug. 29, 2014) ("Even prior to the release of the DSM–V in 2013, courts have held that an ALJ's failure to consider every GAF score is not a reversible error. . . . Since the issuance of the DSM–V, courts have become even more reluctant to find any error in the failure to consider a plaintiff's GAF scores.").

Taking these guidelines into consideration, the ALJ acted appropriately when considering but ultimately dismissing the significance of the GAF score. The mere fact that Dr. Nwokeji assigned Gonzalez a GAF of 40 does not mean that the ALJ was required to find that Gonzalez was disabled. Rather, although Gonzalez's GAF score constitutes some opinion evidence of the severity of his disability, substantial evidence supports the ALJ's conclusion that Gonzalez is less disabled than the GAF score indicates. The ALJ used "the details of the clinician's description": he considered Dr. Nwokeji's findings and noted that while the GAF score did not change, other symptoms and health indicators did vary or improve throughout his reports. Mainella, 2014 WL 183957, at *5. The ALJ concluded that Dr. Nwokeji made an initial GAF finding, which was restated in subsequent reports although Dr. Nwokeji had not re-evaluated and assigned that number. The ALJ provided reasons for his conclusion and his assessment does not constitute error. Cf. Pagan on Behalf of Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996) ("[W]e cannot accept an *unreasoned* rejection of evidence that supports plaintiff's position.") (emphasis supplied).

### B.    Legal Error Standard

#### 1.    Treating Physician Rule

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings

and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Affording a treating physician's opinion controlling weight reflects the reasoned judgment that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). See also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (*per curiam*))). When the ALJ does not give the treating source's opinion controlling weight, the regulations direct him to "always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Where an ALJ does not credit a treating physician's findings, the claimant is entitled to an explanation. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

Here, the record demonstrates that the ALJ considered all of the evidence in the record, including the reports of both treating physicians, Drs. Pierce and Nwokeji, the opinions of two consultative physicians, Drs. Joshi and Meadow, as well as the reports of the reviewing, non-examining physicians, Dr. Altmansberger and Angeline. See 20 C.F.R. §§ 404.1527(c), § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

But the ALJ did not explain what weight he afforded any of those opinions, which is best practice pursuant to the regulations' guidelines and commitment to transparency. Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(c)(2). Where, as here, the ALJ did not discredit the treating physicians' opinions, however, his failure to explicitly state that he gave the opinions controlling weight does not necessarily necessitate remand.

The ALJ did not discredit either treating physician's findings or any of the other physicians' findings (other than Dr. Nwokeji's specific GAF finding). Collectively, the physicians' opinions support one another, and none reaches a vastly different conclusion than the rest regarding any of Gonzalez's specific capabilities or limitations. Rather, they point to a general consensus that although Gonzalez does have severe impairments, they do not have a significant impact on his overall ability to function and work. Any shortcoming in the ALJ's explanation is harmless error that does not require remand. See Neal ex rel. Z.I.N. v. Comm'r of Soc. Sec'y, 11 Civ. 1063 (GLS), 2012 WL 5880667, at *3 (N.D.N.Y. Nov. 21, 2012) ("Remand based on this shortcoming, however, would be futile, as the ALJ's determination of non-disability is supported by substantial evidence even absent any consideration of [an acceptable medical source's] findings, and it is clear that, if considered, [the source's] assessment could have only bolstered the ALJ's conclusion regardless of the weight which it received."); Zubizarreta v. Astrue, 08 Civ. 2723 (RJD)(RL), 2010 WL 2539684, at *2 (E.D.N.Y. June 16, 2010) ("While the Court recognizes that remand for further development of the record is typically warranted when an ALJ fails to properly apply the treating physician rule so that the Commissioner can correct the error and then determine whether a claimant is disabled, the Court concludes that here remand would be futile as correct application of the rule can only lead to [one] conclusion . . . ."); Byrd v. Apfel, 99 Civ. 2345 (FB), 2000 WL 1100336, at *3 (E.D.N.Y.

Aug. 2, 2000) ("The Court . . . need not remand to the ALJ where 'application of the correct legal standards to the record could lead to only one conclusion.'" (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987))).

### 2.    Credibility Finding

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (dictating than an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the claimant's daily activities, the location, nature, extent, and duration of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 71 (2d Cir. 2013) ("Cichocki II") (citing 20 C.F.R. § 415.929(c)(2)); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3).

SSA regulations provide that the ALJ must assess a claimant's credibility before evaluating her RFC, not the other way around. See Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996)); Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *16 (S.D.N.Y. July 2, 2013) ("Cruz II") (collecting cases). Dismissing a claimant's testimony based on its incompatibility with an RFC "gets things backwards" because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012)). See also Molina v. Colvin, 13 Civ. 4989 (AJP), 2014 WL

3445335, at *14 (S.D.N.Y. July 15, 2014) ("Neither the Social Security regulations nor this Circuit's caselaw support the idea that an ALJ may discredit a claimant's subjective complaints on the basis of the ALJ's own finding of the claimant's RFC." (collecting cases)); Otero v. Colvin, 12 Civ. 4757 (JG), 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief.").

Here, the ALJ wrote that Gonzalez's statement were "not credible to the extent that they [were] inconsistent with the above residual functional capacity assessment." (AR 17.) Use of this boilerplate language is error. Credibility is to be measured against objective medical evidence, not against the ALJ's own assessment of a claimant's capacity. See also Cruz II, 2013 WL 3333040, at *15-16 (holding that the ALJ must determine the claimant's credibility in light of the objective record evidence). Remand, however, is not necessary because the Court has independently compared Gonzalez's statements about the intensity, persistence, or limiting effects of his impairment to the objective medical and other evidence in the record and finds that the ALJ's credibility finding is supported by substantial evidence. Further, other portions of the ALJ's decision also indicate that the ALJ did consider Gonzalez's credibility vis-à-vis other medical evidence in the record and did credit some of his testimony, as instructed by the guidelines. See Cichocki II, 534 F. App'x at 71. For instance, the ALJ acknowledged that Gonzalez's "allegations are believable," but concluded that, despite those allegations, Gonzalez "would not be considered disabled merely because of an inability to lift and carry heavy objects coupled with an inability to stand for very long periods of time." (AR 17.) See Wischoff v. Astrue, 08 Civ. 6367 (MAT), 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010) ("Failure to

expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are 'sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'" (quoting <u>Delk v. Astrue</u>, 07 Civ. 0167 (JTC), 2009 WL 656319, at *4 (W.D.N.Y. Mar. 11, 2009))).

**CONCLUSION**

For the aforementioned reasons, I find that the ALJ's decision is supported by substantial evidence and does not contain legal error requiring remand. Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED, and the case is dismissed with prejudice.

**SO ORDERED.**

_____

SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
        April 1, 2015